**Aaron Lyndale COOPER, Petitioner,**

v.

**Joseph McGRATH, Respondent.**

**No. C 02–5569 SI.**

United States District Court,
N.D. California.

April 14, 2004.

Aaron L. Cooper, Represa, CA, for Petitioner.

Christopher William Grove, San Francisco, CA, Alameda County Public Defender's Office, Oakland, CA, for Respondent.

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

ILLSTON, District Judge.

### INTRODUCTION

This matter is now before the court for consideration of the merits of Aaron Lyndale Cooper's *pro se* petition for writ of habeas corpus concerning his 1996 conviction for murder, kidnapping and carjacking. For the reasons discussed below, the petition will be granted.

### BACKGROUND

Cooper was convicted of kidnapping, carjacking and murder. To summarize, the evidence showed that on August 3, 1995, three men (identified by some witnesses as Cooper, Cross and Kingdom) were in a parked blue car near an intersection in Oakland looking for Coco. A Corvette pulled up with Coco in the passenger seat. Coco got out of the car, talked to the three men briefly and was then put in to the trunk of the blue car at gunpoint. The blue car drove away with Coco in the trunk and the Corvette was driven away by a man (identified by a witness as Cooper). Coco's dead body was found two weeks later in the Oakland hills. He had been gagged and shot in the head. Cooper was arrested in Oakland seven hours after the abduction, Cross was arrested in Mississippi about a week after the abduction and Kingdom was arrested in Mississippi about three months after the abduction. Cross and Cooper were tried jointly, in a jury trial which started November 29, 1995 and which ended with a guilty verdict on January 5, 1006. Kingdom, who was arrested just about a month before the trial of Cross and Cooper, was tried separately. The police had taped statements from Cross and Kingdom admitting their presence at the crime but downplaying their roles in the crime. Cooper presented an alibi defense. All three were convicted.

### A. *The Crimes*

The description of the evidence presented about the crimes is lengthy, owing partly to conflicting versions of the events and partly to different people seeing only certain parts. Rather than add yet another new lengthy description of the crimes, the court adopts the California Court of Appeal's description of the evidence, with which neither party has taken issue. The California Court of Appeal described the facts:

At approximately 4 p.m. on August 3, 1995, the victim, William Highsmith known by the nickname "Coco," rode as the passenger in a red Corvette driven by Kevin or "K.K." Parker to a location in front of a liquor store on the corner of 12th and Market Streets in Oakland, California. Minutes later he was abducted. Parker testified that he borrowed the red Corvette from his girlfriend, Tisha Williams, and picked up the victim earlier that afternoon to look at car auctions. Afterwards, they returned to West Oakland and he parked the Corvette in front of the liquor store. The victim got out of the car and began talking to someone in a group of people.

Parker was then "grabbed from behind" and told to leave the area. He could not identify the defendants or other people at the scene. Immediately after the incident, an Oakland Police Officer, Michael McArthur, took a statement from Parker containing certain further details. Parker then said he parked behind a blue Oldsmobile with three men inside and entered the liquor store, leaving the victim in the Corvette. As he was leaving the store, he heard gunshots from where he parked the car and saw the Corvette being driven away by a single occupant. The night before, the victim had told him that "some men with guns" were looking for him because they thought he had stolen a Chevrolet IROC.

Parker's girlfriend, Tisha Williams, confirmed that, earlier that day, she had allowed Parker to drive her red Corvette, license number 2YQK292. The victim's sister, Raynetta Thomas, testified that she saw him between 3:30 and 4 p.m. at her mother's home a few blocks away from the crime scene. He arrived as the passenger of a red Corvette driven by Parker and stayed 10 to 15 minutes. He was dressed in an Adidas sweatsuit with matching tennis shoes. The parties stipulated that the red Corvette contained fingerprints of the victim and Parker.

A bystander, Rodney Love, provided a detailed account of the kidnapping, though he could not identify the perpetrators. While he was eating a snack outside the liquor store at 12th and Market Streets, a man approached him from an area where a blue 1989 Oldsmobile Cutlass was parked and asked if he was "Coco." He inferred that the man was carrying a revolver in his belt because his coat was "puffed out." He told him that he was not Coco, and the man walked back to the blue Oldsmobile, in which two other men were sitting. Two of the three occupants of the Oldsmobile wore black jackets and gloves.

According to Love, Parker soon drove up in a red Corvette, with the victim in the passenger seat, and parked behind the Oldsmobile. Parker and the victim got out of the car and began talking to the men in the blue Oldsmobile. One of the three men briefly grabbed Parker by the neck but then let him go, allowing him to run into the store. The three men then "pushed" the victim into the trunk of the blue Oldsmobile and closed the trunk. One of the three people got into the Corvette. Love heard gunshots from the vicinity of the car and then both the Oldsmobile and the Corvette drove off in the same direction.

Other witnesses observed fragments of the same events. A liquor store employee, Musa Hussein, took a quick look at the street when he heard sounds resembling gunshots. He saw Parker outside the store and four men standing between a red Corvette and a blue or gray car. One of the men was a little taller than the others, maybe six feet four or five inches tall. (Defendant Cross is six feet five inches tall.) He also observed one of the men with what appeared to be a gun.

Lauren Tallerico heard four or five gunshots at about 4:15 p.m. as she drove along Market Street toward 12th Street. The shots came back from the vicinity of a blue car, an older model Cadillac or Oldsmobile, containing two Black males, which she observed turn onto Market Street ahead of her and then speed off down 13th Street toward downtown Oakland.

Douglas Wright, an inspector for the district attorney, was driving home on 12th Street at about 4:10 p.m., when he heard two gunshots and saw a man standing behind a red Corvette parked

about 50 feet from the intersection with Market Street. The man came quickly around the car, jumped in, and drove off down Market Street at a high speed. Wright thought the license number of the Corvette was 2YOK933. The man appeared to be in his middle twenties, about 5 feet, 11 inches tall, and weighed about 170 to 180 pounds. After observing Cooper at trial, Wright testified that there was nothing inconsistent with his height and weight and appearance from the person he saw enter the Corvette. (Cooper is 6 feet tall, and 190 pounds, and was 26 years of age at the time of trial.)

At approximately 7 p.m. on the evening of the same day, a motorist, George Archambeau, driving west on the San Mateo Bridge saw a red Corvette stopped in the right hand lane. A Black man of average height, who appeared to come from the passenger seat of the car, was engaged in throwing a package the size of a grocery bag over the side of the bridge into the water. A second African–American male remained in the driver's seat. Archambeau drove around the Corvette but the car soon passed him driving at a high speed. He noted that the license number was 2YQK292.

At 9 p.m. that evening, Moamer Mohamed, an employee of the liquor store at 12th and Market Streets, saw a red Corvette left with the engine running in the entrance to the store's parking lot. When he went to investigate, he saw a tall, skinny Black man, wearing a checked shirt and gloves, running from the parking lot. He associated the Corvette with Kevin Parker. Upon being notified by police, Parker's girlfriend, Tisha Williams, reclaimed the car later in the evening.

Later, at 11 p.m., a late–1970's blue Oldsmobile Cutlass, which Oakland police associated with the kidnapping, was found in East Oakland near 100th Street and Voltaire Street parked in front of the residence of Juanita Walton, a critical prosecution witness. An evidence technician found vehicle registration and miscellaneous papers, which identified Miltonous Q. Kingdom, a cousin of defendant Cross nicknamed "Q," as the owner of the car.

Three employees of the E–Z 8 Motel near the Oakland Coliseum testified that defendant Cross and another man registered in room 331 on July 23, 1995, and checked out around 9 or 10 a.m. on August 4, 1995. The on-site manager, Robert Britton, identified Kevin Parker as a motel guest to whom he once advanced some money to receive a U.P.S. package and testified that he had also seen defendant Cooper on occasions at the motel. The motel's registration form, introduced as a business record, identified Cross' car as a blue IROC. Another motel employee, Henry Reel, saw defendants Cross and Cooper staying in room 331. The occupants of that room used a blue IROC, and he observed them put their belongings into this car when they vacated the room on the morning of August 4, 1995. He also saw a red Corvette parked in the motel lot 10 or 15 times during the period that Cross resided there. When shown a photograph of Kevin Parker, he identified him as a person who had stayed in room 310 of the motel at that time.

On August 16, 1995, a partially decomposed body was found in a wooded area in the Oakland hills accessible by a service road. The body was identified by the Adidas sportswear and personal belongings in a pocket as that of the victim, William Highsmith. A portion of the shirt had been torn away and a cloth gag tied over the mouth. A scissors lay a few feet away on the ground. An autopsy revealed that the victim had

died of a bullet wound to the head. A criminalist examined the slug extracted from the victim's brain and three shell casings found at the kidnapping scene. He determined that the casings were from a 9 millimeter firearm but that the slug was fired from a separate .40 caliber gun.[1]

A separate line of evidence served to establish a plausible connection between the defendant Cooper and a jacket and gloves with gunshot residue. At 11:30 p.m. on the evening of the kidnapping, an Oakland Police Officer, Darrin Downum, stopped a car driven by one Carl Anderson on 99th Avenue in East Oakland for having expired registration tags. The defendant Cooper sat in the front passenger seat, wearing a plaid shirt. When Cooper got out of the car, Officer Downum observed a pair of gloves on his seat and a jacket in the back seat. Both Anderson and Cooper were arrested, and the car taken to a storage facility.

Anderson's mother picked up the car the next day and drove it to her back yard where she locked it. A couple days later a police detective asked her about the jacket in the car and she said it did not belong to her son, but at trial she would say only that it was not familiar. She never saw her son wear gloves, though he had once been given a pair. Anderson's father similarly testified that the jacket was unfamiliar and that his son did not wear gloves. In contrast, when called as a witness for the defense, Anderson testified that the jacket was in fact his and that the gloves were in the car when he bought it. A criminalist testified that he found gunshot residue

on both gloves and on the left cuff of the jacket.

The prosecution's case on the issue of identification of the defendants Cooper and Cross rested chiefly on the testimony of two women, Zanetta Hodges and Juanita Walton known by the nickname "Goodie," and on an out-of-court statement of Miltonous Q Kingdom. At approximately 4 p.m., on the afternoon of the crime, Hodges drove down 12th Street with Walton in the passenger seat. Upon stopping at the intersection of 12th and Market Streets, Hodges heard someone call her name and backed up a car length to come even with a blue Oldsmobile parked near the corner. There were three people in the car. Sitting in the back seat was defendant Cooper, whom she had met before at Walton's home and on another occasion. He wore a dark jacket and black gloves. Defendant Cross sat in the driver's seat. She had seen him once before near Walton's home driving a blue IROC automobile. She knew the third man by the name "Q."

Pointing to a group of youths standing outside the liquor store, Cooper asked Walton if one of "those guys was Coco." Walton replied in the negative. Defendant Cross then said, "That nigger took my car, Goodie." Walton expressed disbelief, saying that Highsmith was "not trying to get his shoes dirty." At that point a red Corvette pulled up behind the blue Oldsmobile. Defendant Cooper said "bye" to the two girls, and they drove off to a Grand Street store about six blocks away where Walton obtained food stamps.

---

**1.** This statement in the California Court of Appeal's opinion is not supported by the record. The evidence was that there were three casings at the abduction area: two 9MM casings and one .40 casing. The criminalist testified that the two 9MM casings didn't match the bullet in the victim's head, but there was no testimony that the .40 casing at the abduction area did or did not match that bullet. There was, however, evidence that the .40 casing was bent and oily, as if to suggest it had been in the area for a while.

As they left the intersection, Hodges saw Parker and Highsmith, both of whom she knew, leave the red Corvette and meet the three men in the Oldsmobile, who also got out of their car. After obtaining the food stamps, the girls returned to the intersection of 12th and Market Streets and found police officers and a crowd of people. It was stipulated that the records of the Grand Street store revealed that Walton bought food stamps at 4:09 p.m. and that police records disclosed that the first telephone call reporting the kidnapping occurred at 4:08 p.m.

The prosecution introduced into evidence the preliminary hearing testimony of Walton after the trial court ruled that she was unavailable for testimony. Walton testified that she had known Parker and Highsmith for years and saw defendants Cross and Cooper as well as Cross's cousin, "Q," on a "daily" basis before the incident. She recognized the blue Oldsmobile parked at the corner of 12th and Market Streets as "Q's" car. After she and Hodges returned to the scene, she represented to police that she had been an eyewitness of the kidnapping.[2] Later, she identified defendant Cooper in police custody as the man, who had sat in the back seat of the car. She recalled that Cooper was wearing gloves and a T-shirt at the time of the incident; she later saw him wearing a checkered Pendleton shirt at the police station. Walton gave police two somewhat inconsistent, tape-recorded statements, which were both played to the jury. At the preliminary hearing, she conceded that she was not an eyewitness and retracted many of her previous statements. Nevertheless, her varying accounts of the incident contained evidence corroborating every relevant point in Hodge's trial testimony, except her description of Cooper wearing a dark jacket.

An Oakland Police Officer, Larry Krupp, presented a redacted transcript of a statement that Miltonous Kingdom gave when contacted in a Mississippi jail. On November 8, 1995, after learning that Kingdom was under arrest, Krupp and another officer traveled to Greenville, Mississippi, to take custody of him on arrest warrants for Highsmith's kidnapping and murder. When he met Kingdom in the local jail and explained his purpose, Kingdom responded, "I'm not guilty" and initially denied any involvement in the kidnapping. Krupp played a brief excerpt from a tape-recorded statement of defendant Cross. Kingdom then gave a statement providing a complete account of the kidnapping and murder. At trial, Krupp read to the jury a transcript of selected portions of the statement.

Before the incident, Kingdom had been staying with his cousin, defendant Cross, in a motel in Oakland. That day, he drove in his blue Oldsmobile to 100th Avenue and MacArthur in East Oakland "to hook up with" defendants Cross and Cooper. Cross drove the car to a store at the intersection of 12th and Market Streets in West Oakland as he sat in the front passenger seat and Cooper in the back seat. There, they talked to a girl named Goodie until a red Corvette drove up and parked behind them. He and the two defendants got out of their car and talked on the sidewalk to two men in the Corvette. Defendant Cross spoke to the men about "the car." Defendant Cooper then drew a 9 millimeter hand-

---

2. This statement in the California Court of Appeal's opinion is not supported by the record. Walton did not speak to the police at the crime scene. She first spoke to police officers after the car used in the abduction was recovered in front of her house several hours later.

gun and ordered one of the men to get into the trunk of his Oldsmobile. The man complied.

Defendant Cooper entered the red Corvette while Kingdom and defendant Cross got back into the Oldsmobile. They went to the Oakland hills and stopped on a dirt road in the woods. All three men "went to the trunk." A portion of Highsmith's clothes was torn off and tied to his mouth. Defendant Cooper pulled down the man's pants. The man was then shot in the face· and fell to the ground.

Testifying in his own behalf, defendant Cooper presented an alibi defense in which he denied being at the crime scene or seeing defendant Cross or Kingdom on the day of the crime. He claimed that he drove his wife to California State University at Hayward in the morning. He later took his Eagle Talon car to Mission carwash in Hayward and picked up his wife at approximately 3 p.m. They paid accounts at a Nordstrom store, returned to their apartment, and watched a video. Around 9 p.m., he left their apartment to go to a card game in East Oakland. He ran into Carl Anderson and rode around in his car until he was arrested later in the evening. Cooper's wife took the stand to support the defense. In addition, an employee of Mission carwash testified that he had record of washing an Eagle Talon on August 3, 1995, and remembered seeing Cooper on that date.

In contrast, defendant Cross presented a defense that conceded much of the prosecution's case, disclaiming only personal responsibility for the kidnapping and murder. He testified that he owned a blue Chevrolet IROC which he intended to take to Greenville, Mississippi. His plans were frustrated when the car was stolen on July 30, 1995, while loaded with thousands of dollars of drugs. Defendant Cooper had contributed over $2000 to the purchase of the drugs stolen with the car. He began searching for the car in West Oakland and was told that a person named Coco was driving the blue IROC around the neighborhood and trying to sell it. He gave a person he met on the street his pager number and a message to have Coco call him.

In the afternoon of August 3, 1995, Cross and his cousin, Kingdom, joined defendant Cooper at 100th and MacArthur. While they were together, Cross received a call from Coco on his pager and made arrangements to meet him at the liquor store on 12th and Market Streets. Cross drove Kingdom and Cooper to this location in Kingdom's blue Oldsmobile. He got out of the car and asked people near the store if they were Coco. He did not see Juanita Walton and did not know Zanetta Hodges.

At this point, a red Corvette drove up. Stepping out of the car, a man introduced himself as Coco and denied taking the IROC. Cooper then grabbed him and threatened him with a gun. For his part, Cross walked back to the Oldsmobile and entered the car. As Cross sat in the passenger seat of the car, Kingdom got the car keys and opened the trunk. From his position inside the car, Cross did not see the man being put in the trunk but he heard the trunk close.

Running to the passenger side of the car, Kingdom told Cross to move to the driver's side and take off. Cooper got in the red Corvette. Cross drove to 100th and Voltaire where Cooper joined them in the red Corvette. Cooper and Kingdom then drove away in the two cars, but he did not go with them. About two minutes later, they returned in the Oldsmobile. Cross reentered the car and drove to his motel. Later, Cooper drove them to 100th and MacArthur but said nothing about the person they had ab-

ducted. Cross stayed at this location while Cooper and Kingdom drove off again in the Oldsmobile. The next day he took a plane to Mississippi. He did not ask and was not told what happened to the man in the trunk.

As impeachment, the prosecution played taped statements in which Cross said that he and Kingdom helped put the victim in the trunk. Cross insisted that he was not truthful in making the statement and never had any intention to kidnap or murder the victim.

Respondent's Exhibit B (Cal. Ct.App. Opinion filed Nov. 9, 1998), ¶. 2–10.

## B. *Procedural History*

The jury found Cooper and Cross guilty. Cooper was convicted of first degree murder, kidnapping, carjacking, and being a felon in possession of a firearm. *See* Cal.Penal Code § § 187, 207, 215, and 12021. The jury found true the allegations that Cooper was armed with a firearm in the commission of the murder, carjacking and kidnapping. The trial court found in a separate proceeding that Cooper had served a prison term for prior conviction of a felony and had been convicted of a serious felony that qualified as a prior strike conviction under California's Three Strikes law. Cooper was sentenced to a total term of 71 years to life.

An appeal ensued. The California Court of Appeal affirmed the conviction in an opinion filed November 9, 1998. *See* Resp. Exh. B. The California Supreme Court denied Cooper's petition for review. The U.S. Supreme Court granted his petition for writ of certiorari, vacated the judgment and remanded the case for reconsideration in light of *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). On remand, the California Court of Appeal reinstated the judgment and affirmed the conviction in an opinion filed July 6, 2000. *See* Resp. Exh. A. The California Supreme Court denied Cooper's second petition for

review and the U.S. Supreme Court denied his second petition for writ of certiorari. Cooper also unsuccessfully sought collateral review in state court.

Cooper then filed this action for a writ of habeas corpus in November 2002. His amended petition filed on June 5, 2003 contained eleven claims for relief, of which the court found eight cognizable. Respondent was ordered to file an answer to these claims: (1) a Confrontation Clause violation in the admission of Kingdom's statement, (2) a due process violation based on prosecutorial misconduct in eliciting improper testimony on three occasions (i.e., the cross-examination of Cooper about a trial in which Cooper introduced expert testimony about guns, the cross-examination of Cooper's wife about her 1993 marriage to Cooper in jail, and the cross-examination of co-defendant Cross about Cooper's alleged prior bad acts of shooting at people), (3) a Confrontation Clause violation in the admission of Goodie Walton's preliminary examination testimony, (4) a due process violation in the method used by inspector Wright to identify Cooper in the courtroom, (5) a due process violation in the failure to sever the trials of Cooper and Cross, (6) a due process violation because the record on appeal was incomplete, (7) a due process violation based on the insufficiency of the evidence, and (8) a cumulative error claim. Respondent filed an answer and Cooper filed a traverse. The matter is now ready for consideration on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Alameda County, California, which is locat-

ed within this judicial district. 28 U.S.C. 2241(d).

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Williams (Terry) v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties agree that state court remedies were exhausted for the claims in the present petition.

## DISCUSSION

### A. *In–Court Identification By Witness Wright*

Douglas Wright testified for the prosecution about what he saw and heard when he drove by the liquor store at 12th and Market at about 4:00 p.m. Wright was a retired policeman who worked as an inspector for the district attorney's office. Wright heard what sounded like two gunshots and saw, among other things, a man getting into a red Corvette and departing hurriedly. He saw the man directly and as a reflection in the mirror of his car when he drove by the scene. After the man drove away, Wright pulled his car up next to the red Corvette at a street light where Wright observed the man again. Wright described the man as Black, in his mid–20s, about 5'11" and 170–180 pounds.

When the prosecutor attempted to have Cooper stand up in court so Wright could try to identify him, defense counsel objected. A conference was held outside the presence of the jury to discuss the identification problem. No line-up had been done before the trial for this witness and the prosecutor acknowledged that Wright had not seen the person well enough to be able to make a specific, personal identification. RT 750. Defense counsel thought the identification was too vague: "We're talking about a five-eleven Black man, in the city of Oakland, weighing approximately 170–180 pounds." RT 752. When the jury was *not* present, Cooper stood next to counsel table and Wright was asked, "Is there anything inconsistent about Mr. Aaron Cooper, the person who has just stood up, and the person that you saw get into the red Corvette that you already testified about?" Wright answered, "He matches, basically, the height and the weight and age." RT 751. The court overruled the defense objections and allowed the identification. RT 753. When the jury returned, Wright repeated his identification of Cooper:

Q. Now, after the jury left this morning, did you have an opportunity to observe the defendant in this case, Aaron Cooper?

A. Yes.

Q. And would you describe if there's anything inconsistent about his height and weight and appearance from the person that you saw get into the red Corvette?

A. There's none.

RT 756.

On cross-examination, defense counsel elicited some helpful testimony from Wright. Wright admitted that he did not recall how the man was dressed, admitted that he did not know whether the man wore his hair in dreadlocks as Cooper did, admitted that in his years as a police officer he had stopped many people who were Cooper's size, admitted that he did not see the man holding anything although Wright had looked at the man's hands, admitted that he had fractions of a second to observe the man, and admitted that after he heard the gunshots he tried to determine where the gun was but did not see any signs of a gun and did not see a gun in Cooper's hand.

The California Court of Appeal rejected Cooper's claim that Wright's in-court identification of Cooper was irrelevant and prejudicial. "We see relevance ... in the fact that Wright could say that the man resembled Cooper. Though his testimony did not have the probative value of a personal identification, it still had some 'tendency in reason' to prove Cooper's presence at the kidnapping scene." Resp. Exh. B, p. 33.

■ "A conviction which rests on a mistaken identification is a gross miscarriage of justice." *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Procedures by which the defendant is identified as the perpetrator therefore must be examined to assess whether they are unduly suggestive. "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198,

93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Due process protects against the admission of evidence deriving from suggestive identification procedures. *See id.* at 196, 93 S.Ct. 375; *cf. Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 n. 9 (1977) (standards are not different for pretrial and in-trial identifications). Unnecessarily suggestive identification procedures alone do not require exclusion of in-court identification testimony, however; reliability is the linchpin in determining the admissibility of identification testimony. *See id.* at 114, 97 S.Ct. 2243. In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. *See id.* at 114, 97 S.Ct. 2243; *Neil*, 409 U.S. at 199–200, 93 S.Ct. 375.

■ To obtain habeas relief, Cooper must show that the in-court identification was unnecessarily suggestive *and* not sufficiently reliable. An in-court identification of a defendant who looks different from everyone else around him and is clearly the person on trial may be suggestive. *See United States v. Rogers*, 126 F.3d 655 (5th Cir.1997) ("it is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant"). Asking Wright to identify a particular man at the defense table was suggestive if Cooper looked different from those around him—a fact that this court cannot determine from the appellate record—although for the reasons mentioned later, Wright's "identification" was so generalized that it was of

little value. In any event, suggestiveness alone is not enough. Cooper has not shown that the identification testimony was unreliable. Consideration of the factors identified in *Manson* regarding the reliability of the identification leads to the conclusion that the evidence was not unreliable. First, Wright had just a fleeting opportunity to observe the man as Wright drove by, but Wright also saw the man up close when he pulled his car up next to the man's car at a stop light. Second, Wright was likely more attentive than an average citizen because he was a retired police officer alerted by gunshots. *Cf. Manson*, 432 U.S. at 108, 97 S.Ct. 2243 (trained police officer who realized he would have to find and arrest the person with whom he was dealing was paying attention to the identity of the person). Wright's attention had been drawn to the scene because he heard what sounded like two gunshots; he scanned the scene to try to figure out what was going on. This was not a situation where a person observed what appeared to be neutral facts but later turned out to be relevant to a criminal act. When Wright heard the gunshots in the urban locale, he doubtless was thinking it was a crime scene. And this was not a situation where the witness was the distressed and distracted victim of a crime. Third, Wright's prior description at the scene of the abduction had been general but so was his trial testimony. Fourth, the level of certainty demonstrated by Wright was adequate at trial. As to both the third and fourth points, the facts cut against Cooper because Wright's description was rather general, but so was his trial testimony. He did not actually identify Cooper as the man who drove the Corvette, but rather was only asked whether Cooper had characteristics not inconsistent with those of that man. The testimony was far less damaging to the defense than if Wright had said Cooper actually was the man. Fifth, only about four months had lapsed between the observation of the witness and the identification. Four months is not a long time in light of the generality of the description and the identification testimony given. It is far easier to believe that a witness could keep in his mind for four months an image of the general type of person he saw rather than the exact person he saw. Considering the various factors together, this court finds that the in-court identification was sufficiently reliable.

Wright did not say that Cooper was the man, but only that Cooper's height, weight and appearance were consistent with those of the man he had seen at the crime scene. Bearing in mind that the body of law about identification testimony is aimed at avoiding mistaken identification, one can say with confidence that there was no likelihood of mistaken identification by Wright. The vice of the admission of Wright's testimony was its weakness, rather than that it may have been mistaken: one can reasonably guess that hundreds or thousands of men in the Bay Area would have an appearance consistent with the description of a Black male in his mid–20s, about 5'11" tall and about 170–180 pounds.[3]

The identification was weak and quite limited in that the witness only said Cooper's appearance was consistent with that of the man observed earlier. The defense obtained testimony that established the witness' limited opportunity to observe, the commonness of defendant's size, and the absence of a gun in the man's hands. Cooper's right to due process was not violated by the admission of Wright's testimony that Cooper's appearance was not in-

---

3. Though weak, the evidence was relevant in that it had some tendency in reason to prove Cooper's presence at the kidnapping scene, as the California court of appeal found. Because the evidence had some relevance to an issue in dispute, it was properly admitted.

consistent with that of the man he saw driving the red Corvette. Cooper is not entitled to the writ on this claim.

## B. *The Appellate Record*

Cooper claims that his right to due process was denied because his appellate record was incomplete. At trial, the court reporter had problems with her stenography machine. Cooper's appellate counsel raised questions about the accuracy of the appellate record and sought to settle the appellate record. Cooper's counsel thought Douglas Wright's testimony was not transcribed fully. Cooper's counsel thought that the transcript had omitted a couple of questions and answers to the effect that Wright's description of Cooper "fit the description of half the young Black male population in Oakland" and that Wright could not identify the person he saw in the Corvette. See Exh. C to Resp. Exh. I. A post-conviction hearing was held by the trial court to settle the record, after which the trial court denied Cooper's application to settle the record. Resp. Exh. H.

■ If a state creates a system for appellate review as an integral part of the system for finally adjudicating the guilt of a defendant, the procedures used must comport with demands of due process and equal protection. *See Evitts v. Lucey,* 469 U.S. 387, 393, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (citation omitted). The failure to provide a criminal defendant with a transcript of the trial court proceedings which effectively denies him his right to a timely appeal may deprive him of his constitutional right to due process of law. *See Madera v. Risley,* 885 F.2d 646, 648 (9th Cir.1989) (state's failure to provide full record of trial may violate defendant's due process rights and form basis for federal habeas corpus relief). Two criteria are relevant to the determination of whether an adequate record has been supplied: (1)

the value of the transcript to the defendant in connection with the appeal or trial for which it is sought; and (2) the availability of alternative devices that would fulfill the same functions as a transcript. *See Britt v. North Carolina,* 404 U.S. 226, 227 n. 2, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971); *Madera,* 885 F.2d at 648. A habeas petitioner also must establish prejudice from the lack of recordation to be entitled to habeas corpus relief. *See id.* at 649.

Cooper cannot prevail on his due process claim on the facts. After a post-conviction hearing in the trial court, that court rejected Cooper's claim that the record was inaccurate and denied the application to settle the record. The court presumes correct the court's apparent factual finding that Cooper's counsel was incorrect in his assertion that the transcript omitted two questions and answers. 28 U.S.C. § 2254(e)(1). Cooper has not rebutted that presumption at all, let alone by clear and convincing evidence.

■ Even if the alleged inaccuracy did exist in the transcript, it was harmless error because the rest of Wright's testimony that was transcribed clearly conveyed that his description of the man he saw was *very* general and that he was only able to say that Cooper's appearance was not inconsistent with that of the man he saw. *See* Section A, above. Cooper is not entitled to the writ on this claim.

## C. *Denial Of Severance Request*

The California Court of Appeal upheld the trial court's denial of Cooper's motion for separate trials for Cooper and Cross. The appellate court noted that there was a legislatively expressed preference for joint trials of co-defendants and that separate trials were within the trial court's discretion.

In reviewing the trial court's exercise of discretion on the motion to sever, we

place great weight on the fact that this was a trial involving common action against the same victim falling squarely within the policy of Penal Code section 1098 favoring joint trials. With the redaction of Cross's statements, the only prejudice to Cooper related to his alibi defense. We have found no authority indicating that an alibi defense entitles a defendant to a separate trial to shield the alibi defense from conflicting evidence of a codefendant. The present case does not differ significantly from the common case involving alibi defense. If Cooper were entitled to severance, the policy favoring joint trials would be significantly undermined. Furthermore, we note that, while Cross's defense conflicted with Cooper's alibi defense, it did not necessarily incriminate Cooper. Cross did not directly accuse Cooper of the crime. Instead, he denied witnessing the act of forcing the victim into the trunk and denied being present at the murder.

Resp. Exh. B, ¶. 28–29.

 A joinder, or denial of severance, of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process. *Grisby v. Blodgett,* 130 F.3d 365, 370 (9th Cir.1997); *Herd v. Kincheloe,* 800 F.2d 1526, 1529 (9th Cir.1986). A federal court reviewing a state conviction under 28 U.S.C. § 2254 is limited to determining whether the state court's joinder or denial of his severance motion resulted in prejudice great enough to render the trial fundamentally unfair. *Grisby,* 130 F.3d at 370. This prejudice is shown if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict. *Sandoval v. Calderon,* 241 F.3d 765, 772 (9th Cir.2000), *cert. denied,* 534 U.S. 847, 122 S.Ct. 112, 151 L.Ed.2d 69 (2001).

 "Antagonism between defenses or the desire of one defendant to exculpate himself by inculpating a codefendant . . . is insufficient to require severance. . . . To be entitled to severance on the basis of mutually antagonistic defenses, a defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant." *United States v. Throckmorton,* 87 F.3d 1069, 1072 (9th Cir.1996), *cert. denied,* 519 U.S. 1132, 117 S.Ct. 993, 136 L.Ed.2d 874 (1997); *see also United States v. Angwin,* 271 F.3d 786, 795 (9th Cir.2001), *cert. denied,* 535 U.S. 966, 122 S.Ct. 1385, 152 L.Ed.2d 375 (2002) (same). In *Throckmorton,* the defendant's theory was that there was insufficient evidence to show drug importation conspiracy while his codefendant's theory was that a drug transaction had occurred but that he was involved solely as a DEA informant. The court found the defenses were not irreconcilable at their core because the jury could find both that the codefendant was working for the DEA and that there was insufficient evidence to convict defendant. *Id.* at 1072. Acceptance of the codefendant's defense would not have precluded the defendant's acquittal. *Id.* Although the codefendant's testimony was devastating to defendant's defense, the defendant could not show that same devastating testimony would not have been admitted if the trials had been severed. *Id.* (rejecting defendant's conjecture that codefendant, who declined to assert his Fifth Amendment right in a joint trial, would have exercised his Fifth Amendment right had they been tried separately).

 Cooper and Cross did not have sufficiently antagonistic defenses. Cross' defense was that he was present but was in the front passenger seat when Coco was

put in the trunk and that he had left the criminal adventure before Coco was killed. Cooper's defense was that he was not present at all. Cross' defense was not, at its core, so irreconcilable with Cooper's alibi defense that the acceptance of Cross' defense necessarily precluded acquittal of Cooper. Both defenses could have succeeded. The jury could have believed that there was sufficient evidence that Cross was there but insufficient evidence that he was more than a spectator while still finding there was insufficient evidence that Cooper was even present at the crime scene. Although the defenses were not harmonious, they also were not mutually exclusive.

The problems that can result from joint trials were largely addressed and avoided at Cooper's trial. The jury was instructed that some of Cross' statements were evidence only against Cross when (before Cross elected to testify) the prosecution presented a redacted statement from Cross. The jury was instructed that it was to separately consider each count and to separately consider each defendant. Cooper also has not shown that there was evidence he wanted to introduce but could not because it was a joint trial. No Confrontation Clause problems were created by the holding of a joint trial. Cross testified at the trial and Cooper was able to cross-examine him. Cooper has not shown any reasonable probability that Cross would not have testified at Cooper's trial had they been tried separately.

A joint trial made sense here for the abduction and murder of a single victim. It was not an instance where a defendant was tried for multiple unrelated crimes, such that the sheer number of crimes had a prejudicial spillover effect. And it was not an instance of joining a weak case with a strong one, such that the negative impact of the strong case evidence spilled over and resulted in conviction on the weak case. And it was not an instance of defendants with dramatically different liability exposures because both faced kidnapping, carjacking and murder charges.

The state court's rejection of the severance claim was not contrary to or an unreasonable application of clearly established law. Cooper is not entitled to the writ on this claim.

### D. *Admission Of Goodie Walton's Preliminary Hearing Testimony*

Cooper contends that his right to confront a witness was violated when the trial court admitted the preliminary hearing testimony of Goodie Walton even though the prosecutor had not made an adequate effort to find her to testify at trial.

The California Court of Appeal did not expressly mention the Confrontation Clause in its analysis and instead examined whether the prosecution had been sufficiently diligent in searching for the witness under the standard in California Evidence Code § 240(a)(5), which provides that a person is considered unavailable if she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." The trial court had held a hearing on the prosecution's efforts to serve a subpoena on the witness, concluded that the prosecution had exercised due diligence in an attempt to serve Walton, and ruled that the preliminary hearing testimony could be admitted. The California Court of Appeal examined the record and found adequate efforts to locate the witness had been made: "Without attempting to summarize Lerche's testimony, it suffices to say that he was actively engaged for about a month in efforts to serve Walton or learn of her whereabouts. Cooper faults him for not beginning the search earlier and for making

repeated futile attempts to contact her at a Voltaire Street address, neglecting efforts to trace her receipt of food stamps. Despite these criticisms, we find the People exercised due diligence to locate Walton." Resp. Exh. B, at 31–32.

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." *See Crawford v. Washington,* — U.S. —, —, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004). Prior testimony at a preliminary hearing is testimonial hearsay and is barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness. *Id.* at 1369, 1374.

To establish unavailability, the prosecutor must show that he made a good faith effort to obtain the witness' presence at trial. *See Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *United States v. Olafson,* 213 F.3d 435, 441–42 (9th Cir.), *cert. denied,* 531 U.S. 914, 121 S.Ct. 269, 148 L.Ed.2d 195 (2000) (good faith effort demonstrated where border patrol agents called witness, who had been inadvertently returned to Mexico, but witness refused to return to testify); *Windham v. Merkle,* 163 F.3d 1092, 1102 (9th Cir.1998) (prosecutor made a good-faith effort to locate witness where he subpoenaed witness, met with witness to discuss proposed testimony after issuing subpoena, tried to call witness three times as trial date approached, contacted witness's parole officer, had a bench warrant issued for witness's arrest, and assigned a criminal investigator who searched at places witness was known to frequent).

Whether Walton was unavailable is the crux of the issue in this case. The California Court of Appeal's finding that the prosecutor had proven that he made a good faith effort to locate Walton is not an unreasonable application of or contrary to clearly established federal law. The prosecutor's investigator had been diligently but unsuccessfully searching for Walton for about a month. This court is unpersuaded by Cooper's argument that the prosecutor's investigator really wasn't diligent because the prosecutor didn't really want to find the witness who was hostile to the prosecutor's position. The court also is unpersuaded by Cooper's argument that the investigator was not diligent because he did not start earlier and did not trace her food stamp receipts. The 20/20 vision of hindsight does not mean the steps actually undertaken were not reasonable. Cooper is not entitled to the writ on this claim.

## E. *Admission Of Kingdom's Statement*

Cooper claims that the admission of Miltonous Q. Kingdom's statement to the police that implicated Cooper in the crime violated his rights under the Confrontation Clause. The California Court of Appeal found that there was such a violation, but that the error was harmless. Respondent essentially concedes the Confrontation Clause violation but urges that it was harmless error. The Confrontation Clause error was quite obvious and thus this court, like the state court and the parties, focuses on the harmlessness question.

### 1. *The Statement In Question*

Kingdom was arrested in Greenville, Mississippi about a month before Cooper's trial began. Shortly after his arrest, he gave a statement to Oakland police sergeant Krupp on November 8, 1995, in Greenville, Mississippi. Although Kingdom initially said he was not guilty, he quickly changed his mind after the police played a brief portion of Cross' tape-recorded statement. At trial, a redacted version of Kingdom's statement was read

into the record. RT 1912–1921.[4] The most damaging of Kingdom's statements[5] put all three men (Cooper, Cross and Kingdom) at the site of the murder and present when the murder occurred, although the name of the actual shooter apparently had been redacted. Kingdom also identified Cooper and Cross by name as participants in the abduction. Although Kingdom's statement was redacted in part, the names of Cooper and Cross were repeatedly mentioned in the statement the jury heard.

Oakland police sergeant Krupp read to the jury the transcript of the taped statement he had taken from Kingdom which included the following information. Kingdom stayed in a motel with his cousin Fred in the weeks before the incident. RT 1912–1913. Kingdom hooked up with Fred and Aaron at 100th and MacArthur on the day of the incident when Kingdom was driving his blue car. RT 1913. [Fred and Aaron are the first names of Cross and Cooper.] Fred and Aaron got in the car with Kingdom. RT 1914. Fred drove, Kingdom sat in the front passenger seat, and Aaron sat in the back passenger seat. RT 1914. They drove to a West Oakland store and parked. RT 1915. They talked to a girl named "Goodie." RT 1915. A red Corvette pulled up behind them. RT 1915. They talked to the men on the sidewalk, and the man and Fred were "discussing about the car." RT 1916. Then, Aaron pulled out a gun. RT 1916. Aaron's gun was a 9MM automatic. RT 1917. Aaron then told the man to get into the trunk of Kingdom's car. RT 1917–1918. Fred and Kingdom got back into Kingdom's car and Aaron got into the Corvette.

RT 1918. They then went to the Oakland hills. RT 1919. When they got up to the woods, they stopped off the road. RT 1919. They stopped on a dirt road. RT 1919–1920. The questions by the police and the answers from Kingdom that the jury heard regarding the murder are worth quoting:

Question: Okay. And what happened next?

Answer: We went to the trunk.

Question: Who went to the trunk, all three of you?

Answer: Yeah.

\* \* \* \* \* \*

Question: And what did he do when he tore his clothes off?

Answer: Put them around his mouth.

Question: Put it around where?

Answer: His mouth.

Question: Did anybody pull his pants down?

Answer: Aaron pulled his pants down.

\* \* \* \* \* \*

Question: Okay. Now, what happened next?

Answer: Shot him.

Question: Did he fall on his face or his back?

Answer: His face.

Question: So he landed on his face; is that correct? Is that "yes"?

Answer: Yeah.

RT 1920–1921. On cross-examination by Cross' attorney, Krupp testified that Kingdom said Cross did not have a gun. RT 1949. On cross-examination by Cooper's attorney, Krupp testified that Kingdom told them that Cross drove to 109th and

---

4. Court and counsel discussed the admissibility of the statement out of the presence of the jury. Counsel for Cooper took the position that none of the statement should come in and that Cooper was denied his right to confront the witness. RT 1834.

5. Only one taped statement of one interview was admitted. The references to various statements in the text are not intended to suggest there was more than one taped statement but instead are references to assertions made, sentences spoken or answers given by Kingdom during that one interview.

Foothill and after that Cooper drove up to the Oakland hills and drove back down from the Oakland hills. RT 1944. Also on cross-examination by Cooper's attorney, Krupp testified that Kingdom said that they went back to 109th and Foothill where Cooper got into the Corvette and Cross and Kingdom got into the blue Oldsmobile and went back to their hotel and that Cooper returned about an hour later without the Corvette.

### 2. Confrontation Clause Basics

The Sixth Amendment's Confrontation Clause provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. *See Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington,* —— U.S. at ——, 124 S.Ct. at 1370. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.; see Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination). Even before the recent *Crawford* decision, a declaration against penal interest by an accomplice that implicated a defendant was problematic as it was not considered reliable. *See Lilly v. Virginia,* 527 U.S. 116, 131–34, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality); *see also Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (statement made by an accomplice inculpatory of the defendant is presumptively unreliable under *Roberts* ); *Forn v. Hornung,* 343 F.3d 990, 996–97 (9th Cir.2003) (statements admitted under declaration against penal in-

terest hearsay exception did not have particularized guarantees of trustworthiness). While much remains to be seen about how *Crawford* will be interpreted, it unquestionably tightens, rather than loosens, Confrontation Clause requirements. After *Crawford,* the method of analysis might change but the result in Cooper's case would doubtless remain the same: a Confrontation Clause violation had occurred.

### 3. State Court Analysis

The California Court of Appeal explained why the Confrontation Clause violation was harmless:

These considerations lead us to conclude that it was error to admit Kingdom's statement. This conclusion compels us to examine the record to determine if the error was harmless under the reasonable doubt test of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which governs federal constitutional error. At oral argument counsel noted that the harmless error analysis under *Chapman* is distinct as to each defendant. This is so primarily due to Cross's testimony concerning Cooper's involvement in the crimes and certain physical evidence found at the time of Cooper's arrest. Our review of the record compels reversal of Cross's conviction of murder. We find, however, that the error was harmless beyond a reasonable doubt in the conviction of defendant Cooper for murder.

The record reveals that Cooper possessed a motive for the murder—retaliation for the theft of the car loaded with drugs he had helped to purchase. He had helped Cross search for the perpetrator and joined him in confronting the person they believed was responsible. He played a particularly active and violent role in the kidnapping by brandishing a gun, grabbing the victim, and leading him to the trunk of the car.

Cross testified that Cooper was in a car containing several handguns, with the victim in its trunk, immediately preceding the victim's disappearance. Other testimony plausibly connected him with the carjacking of the red Corvette, disposal of the weapon, and return of the Corvette. When arrested, he was in apparent possession of a jacket and gloves which tested positive for gunshot residue. He was seen wearing a similar jacket and gloves earlier in the evening and the jacket and gloves did not belong to his companion at the time of his arrest. Taking the stand, he presented an alibi defense that did little more than cast doubt on his veracity by contradicting well-established facts. The direct and circumstantial evidence against Cooper demonstrates to us beyond a reasonable doubt that the error did not contribute to the verdict.

Resp. Exh. A, pp. 25–26.

4. *Analysis of Harmlessness of Error*

■■■■ Trial errors that occur during the presentation of the case to the jury are amenable to harmless-error analysis because they may be quantitatively assessed in the context of other evidence presented in order to determine their effect on the trial. *See Brecht v. Abrahamson*, 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Arizona v. Fulminante*, 499 U.S. 279, 307, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). A federal habeas petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The error must have resulted in "actual prejudice." *Id.* (citation omitted); *see, e.g., Alvarado v. Hickman*, 316 F.3d 841, 855–57 (9th Cir.), *cert. granted, Yarborough v. Alvarado*, —— U.S. ——, 124 S.Ct. 45, 156 L.Ed.2d 703 (2003) (find-

ing *Brecht* prejudice where confession obtained in violation of *Miranda* was admitted at trial even though defendant testified at trial; defendant's testimony could be disregarded because decision to testify was a tactical choice likely influenced by the prosecutor's use of the confession, and the remaining testimonial evidence was inconsistent or only marginally useful to the prosecution); *Hardnett v. Marshall*, 25 F.3d 875, 881 (9th Cir.1994), *cert. denied*, 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995) (no actual prejudice from introduction of inadmissible hearsay regarding petitioner's intent where petitioner found not guilty of first-degree murder).

A federal habeas court reviewing the prejudicial effect of constitutional trial error does not simply examine whether there was sufficient evidence to support the conviction in the absence of the constitutional error. Regardless whether there is sufficient evidence to support the conviction apart from the error, the court must determine whether the error had a substantial and injurious effect or influence on the conviction. If it did, the court must set aside the conviction. *Ghent v. Woodford*, 279 F.3d 1121, 1127 (9th Cir.2002) (finding prejudice under *Brecht* from admission of evidence obtained in violation of *Miranda* after examining effect of erroneously admitted evidence only on disputed issue of petitioner's mental state, not on undisputed question of whether petitioner actually committed crimes).

■■■ The admission of Kingdom's statement to police had a substantial and injurious effect on the jury's verdict against Cooper. This conclusion is strongest with respect to the murder conviction, but the court also reaches the same conclusion with respect to the kidnapping and carjacking convictions.

Kingdom's statement was the *only* evidence that put Cooper at the murder scene in the Oakland hills. Although Kingdom's

statement was redacted so that the shooter's identity was not revealed, Kingdom's statement identified Cooper by name as being present at the murder scene, as being the person who pulled down Coco's pants at the site of the murder, and as being the person who drove them to and from the Oakland hills. The statement regarding the pants corroborated the coroner's observation that the dead body's pants were down. Kingdom's statement also placed the murder in the Oakland hills where the body was found; he did not claim that Coco had been killed elsewhere and his body dumped in the hills. That was consistent with the prosecution's argument that Coco had been killed where his body was found. Without Kingdom's statement, there was not sufficient evidence to prove beyond a reasonable doubt that Cooper was present at the murder of Coco. Although the sufficiency of the evidence is not the standard for determining whether an error resulted in prejudice, *see Ghent*, 279 F.3d at 1127, the fact that there was insufficient evidence without the improperly admitted evidence shows how powerfully it affected the jury's verdict of guilt on the murder count. The fact that Kingdom's statement was corroborated by the independent evidence that the pants had been pulled down and argument that the victim had been killed where his body was found does not make Kingdom's statement cumulative of other evidence but instead made it even more likely that the jury had to rely on it to determine *who* had killed the victim.

The improperly admitted evidence also tainted the carjacking and kidnapping convictions. Other than Kingdom, the only witnesses who identified Cooper as one of the abductors were codefendant Cross, Goodie Walton, and Zanetta Hodges. Two witnesses—Rodney Love and KK Parker—testified that Cooper was not one of the abductors. The testimony at trial concerning the abduction scene was full of inconsistencies and perhaps lies.

Co-defendant Cross testified that Cooper was with him at the abduction scene. Cross tried to minimize his own participation in the crime by saying that he did not take part in putting Coco in the trunk and he dropped out of the criminal adventure before anything happened to Coco. Cross also gave Cooper a motive (which Cooper had been lacking until about midway through Cross' testimony) by stating that Cooper was one of several investors who had put up money to buy the large stash of drugs in the back of Cross' stolen IROC car. Although the California Court of Appeal referred to Cooper's motive, that court did not note Cross' motive of equal or greater value: they were in search of Cross' stolen car which was worth about $5000, which was more than the $2000–$4000 Cooper reportedly invested in the drugs. Additionally, the alleged plan was of questionable believability: Cross reportedly was going to drive to Greenville, Mississippi to peddle the drugs in his car and then give the investors a return on their investment and make a profit. Cross never testified that Cooper was going to go to Greenville, Mississippi or take any part in the distribution of the drugs. The drug story suspiciously called for the unemployed Cooper to let someone leave the state with his $2000–$4000 worth of drugs and showed Cross leaving unattended a car full of drugs in a parking area when Cross went to visit his girlfriend notwithstanding that he saw several people in the area who looked like they were going to "rip [him] off.".

Walton's testimony [6] causes grave concern to the court because the evidence suggests that Walton was part of the crime

---

6. Walton's testimony from the preliminary hearing was used because she was unavail-

if she was present at the crime scene at all. The testimony from several witnesses suggests that the three men in the blue Delta 88 did not know what Coco looked like and that they were waiting for Coco and expected him to arrive at the 12th and Market location. Walton testified that she was a passenger in a car that drove past the blue Delta 88, but backed up so she could talk to its occupants because she had recognized the car. Her car stopped aside the blue Delta 88 and she chatted for a while until she was told at least "bye" by one of the occupants of the blue Delta 88 when the red Corvette bearing Coco pulled up behind the blue Delta 88. She and her driver then left the scene. Although Walton denied that she had alerted the occupants of the blue Delta 88 that Coco was in the red Corvette that had just arrived, the timing of her arrival, her presence in a car next to the Delta 88 chatting with its occupants, and her departure upon the arrival of Coco easily could be interpreted to be her identifying Coco for the occupants of the blue Delta 88. This court is not alone in seeing something suspicious about Walton's reported behavior: she had received threats from people who thought she had set up Coco. Walton also flip-flopped on several key details, such that she was caught telling different stories in a taped

statement to police and in her preliminary hearing testimony.[7] Although Walton was at the scene after police arrived, she did not speak to police then; she first spoke to police after they found the abduction car parked in front of her house. Another concern with Walton's testimony was the strong possibility that she was not even present at the time of the abduction and that she had given a description of the abduction that was composed of second-hand information she heard from the crowd around the crime scene after the crime had occurred. Both Cross and eyewitness Rodney Love stated that Walton was not there before or during the abduction and KK Parker denied seeing her, Zanetta Hodges, or Zanetta Hodges' car. There also was evidence that suggested that if she had been at the scene at all, she had left the area before the abduction had occurred. The time stamp from the food stamp store a half mile away showed that Walton bought food stamps at 4:09 p.m. and the time stamp from the Oakland police department dispatch record showed that the 911 calls from the shooting started at 4:08 p.m. In light of her description of the crime, her absence from the scene of the crime at the time of the abduction would call into question her credibility overall.[8] In other words, even if she had

---

7. Walton's testimony was riddled with inconsistencies. She gave two taped statements to the police, one or two written statements to the police, and testified at the preliminary hearing where she recanted much of what she had told police.

Depending on which of Walton's statements one wanted to believe, she had (a) not seen anyone with a gun, RT 1055, 1150, or (b) had seen Cooper with a gun and shooting when she returned to the 12th and Market location, RT 1056.

Depending on which statement one wants to believe, Walton (a) saw Cooper shooting, RT 1056, or (b) did not hear any gunshots; RT 1151.

able at the time of trial.

Depending on which statement one wants to believe, the last thing Walton saw was (a) the men starting to get out of their cars, but not yet together, RT 1128, or (b) the men together in the parking lot, RT 1055, or (c) Coco handcuffed and being put in the trunk, RT 1053.

Depending on which statement one wants to believe, Walton (a) saw Rodney Love before the incident, RT 1113, or (b) did not see Rodney Love before the incident, RT 1237.

8. The instructions regarding the evaluation of witnesses included the following:

Discrepancies in a witness's testimony or between his or her testimony and that of others, if there were any, do not necessarily

seen Cooper, Cross and Kingdom in the blue Delta 88 and left before the red Corvette had even arrived, her description of what had transpired when Coco was abducted would cast grave doubt over the truthfulness of any of her testimony. In short, Walton (1) may have been there to facilitate the crime, (2) may not have been there at all, or (3) may have been present earlier but not at the time of the abduction. None of these scenarios made Walton a credible witness about the abduction and the participants.[9] Additionally, the blue car into which Coco was stuffed was found in front of Walton's home the night of the abduction. She knew the car was there, yet there was no evidence that she checked it to see if Coco was still in the trunk.

Zanetta Hodges' version of the abduction also had some inconsistencies, although nowhere near as great as those for Walton.[10] However, the believability of Hodges' testimony largely depends on the believability of Walton's testimony because they were in one car together. Both either were or were not present at the time of the abduction.

Another witness whose testimony causes concern is KK Parker. At best, it was an extremely bad coincidence that Parker parked his car behind another car whose occupants happened to be waiting for Parker's passenger. The sequence of events supports the inference that Parker set up Coco to be accosted by the men in the blue Delta 88. Although Parker remained at the scene and spoke to a police officer,

---

mean that the witness should be discredited. Failure of recollection is a common experience; and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance.

A witness who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars.

CT 798–799. Jurors also were instructed that, in considering an eyewitness account, they were to consider, among other things "[w]hether the witness' identification is in fact the product of [his][her] own recollection." CT 822.

9. Rodney Love testified that he had been asked by a man from the blue Delta 88 whether he was Coco, and had watched the scene to see what unfolded. He never saw Goodie Walton, Zanetta Hodges, or a car pull up alongside the blue Delta 88 before or while the Corvette was there.

10. Hodges' testimony had some internal inconsistencies and had some inconsistencies

when compared with Walton's testimony concerning the afternoon of August 3, when they were both together in her car.

Hodges testified she talked to Cooper, RT 551, 583, although Walton said Hodges did not do any talking when they were stopped alongside the blue Delta, RT 1115. Hodges also said that Walton got out of the car to speak to the occupants of the blue Delta, RT 626, although Walton said they talked while she was sitting in Hodges' car parked alongside the Delta, RT 1115.

Hodges said she had seen Rodney Love by the liquor store before the incident and when they returned to the scene when the police had arrived. RT 582, 592, 610. Hodges also said Walton talked to Rodney Love after the police arrived at the crime scene, RT 599, 626, although Walton denied speaking to Love.

Hodges said that right before she left, the Corvette pulled up and parked. RT 559. She said she saw Parker and Coco get out of the Corvette as she departed slowly. RT 590. She had told an investigator that one of the men in the Delta grabbed Coco and walked him back through the parking lot. RT 630. By contrast, Walton claimed in one of her statements that she had seen Coco put in the trunk.

Parker's refusal to sign his witness statement before he spoke to a lawyer (even after the officer assured Parker it was just a witness statement and Parker was not a suspect) raises an eyebrow. This court is not alone in seeing something suspicious about Parker's reported behavior: the prosecutor also thought Parker had set up Coco. RT 1401 (comment out of presence of jury); RT 2852 (closing argument). Parker did not tell the police officer he knew what Coco was doing at the scene, and claimed at trial that they had just gone to the liquor store to "hang out." RT 1204. Also, Parker denied knowing Cross, Kingdom or Cooper and denied that he had been at the EZ–8 motel in the year before the abduction although workers from the EZ–8 motel identified him as having been there during the same time as Cross and Kingdom.

A read-through of the testimony leaves the court with the strong impression that the eyewitnesses who put Cooper at the abduction scene were far from candid about what occurred. The court has strong doubts that these witnesses and Parker truthfully described what physically happened, why they were at the scene, and what their roles were in the crimes. Left with the impression that so many key witnesses were not candid about so many details, one cannot embrace the trial as a reliable and fair one. Kingdom's statement provided a single common thread by describing the criminal adventure from start to finish. The effect of Kingdom's improperly admitted testimony was to lend credibility to the testimony of all these uncandid witnesses by corroborating the details. See, e.g., RT 2706 (prosecutor arguing that all three men were at the murder scene, an argument based solely on Kingdom's statement); RT 2709 (prosecutor's closing argument that Kingdom corroborated Hodges' and Walton's statements). The prosecutor highlighted Kingdom's statement by reading it all during closing argument. See RT 2713–2720. During its five days of deliberations, the jury asked for a readback of Kingdom's statement, but later decided it did not need the readback. See RT 2981–2983. Kingdom's statement contaminated the entire case against Cooper. Because the Confrontation Clause violation had a substantial and injurious affect on the jury's verdict and the state court's finding of harmless error was an unreasonable application of clearly established federal law, Cooper is entitled to a retrial on all of the charges against him. The writ will issue on this claim.

## F. Prosecutorial Misconduct

Cooper contends that his right to due process was violated when the prosecutor engaged in misconduct by asking Cooper's wife questions to elicit the fact that Cooper was in prison when they married, by asking Cooper about his familiarity with guns, and by asking Cross about Cooper's violent reputation and familiarity with guns. The California Court of Appeal rejected Cooper's claim, concluding that there was misconduct but it was harmless.

 The appropriate standard of review for a prosecutorial misconduct claim in a federal habeas corpus action is the narrow one of due process and not the broad exercise of supervisory power. See Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). A defendant's due process rights are violated when a prosecutor's comments render a trial fundamentally unfair. See id.; Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

 The California Court of Appeal noted that it is misconduct under state law

to deliberately offer inadmissible evidence or to ask questions calling for inadmissible and prejudicial answers. This is not as rigorous as the federal standard on a due process analysis, which requires that the improper questioning of a witness by the prosecutor so infect the trial with unfairness as to make the resulting conviction a denial of due process. *See Ortiz v. Stewart,* 149 F.3d 923, 934 (9th Cir.1998), *cert denied,* 526 U.S. 1123, 119 S.Ct. 1777, 143 L.Ed.2d 806 (1999). In considering whether the questioning deprived the defendant of a fair trial, the witness' testimony should be viewed as a whole to determine the impact of the improper questioning. *See id.* at 934–35 (prosecutor's questioning witness as to whether she was afraid of defendant did not render the proceedings fundamentally unfair in light of witness' other testimony that defendant murdered her mother, stabbed her sister, stabbed her, and then tried to burn down their house while the victims were still inside).

1. *The Problems*

a. *Evidence That Cooper Was In Jail When Married*

 The first problem occurred in the cross-examination of Cooper's wife. "After receiving testimony that she had married the defendant in September 1993 in Vacaville, the prosecutor pursued several lines of questions with the apparent intent of eliciting the fact that Cooper was then in prison. He asked, for example, where she went after the marriage, where he went, and when they began living together.... The prosecution ultimately elicited answers allowing the jury to infer that Cooper was imprisoned at the time of the marriage." Resp. Exh. B, p. 18. This questioning was improper and direct or impeachment evidence because "it was not material to Cooper's guilt that he had been imprisoned at the time of his marriage." *Id.*

This court agrees that it was improper for the prosecutor to pursue this line of inquiry. However, in light of the other evidence that Cooper had a criminal record, the prosecutor's questions eliciting testimony that Cooper had been in jail when married did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.

b. *Evidence About Guns*

Cooper admitted that he had been convicted of robbery and being a felon in possession of a firearm. "To explore the underlying details of these crimes, the prosecution questioned him about his knowledge of guns, past ownership of guns, the use of particular weapons resulting in the robbery and possession charges, and his presentation of testimony about guns in the robbery trial." Resp. Exh. B, p. 18. The California Court of Appeal found that the prosecutor went beyond the proper scope of cross-examination about the prior felonies "in an attempt to portray Cooper as being experienced and sophisticated in the use of guns." *Id.* at 19.

This court agrees that it was improper for the prosecutor to pursue this line of inquiry. The intent to inflame the jury was particularly evident when the prosecutor tried to show familiarity with guns based on the fact that Cooper had presented gun use evidence (apparently through a witness other than himself) in a previous trial. This is a much closer call than for the first alleged instance of misconduct, but the court is not able to conclude that this line of questioning alone so infected the trial with unfairness as to make the resulting conviction a denial of due process. It does, however, affect the cumulative error analysis below.

c. *Reputation Evidence*

The prosecutor asked co-defendant Cross about Cooper's reputation for vio-

lence and Cooper's violent use of guns in the past. The California Court of Appeal found that the questioning regarding reputation and past violent acts was prohibited by California Evidence Code § 1101 and that the prosecutor had not shown the line of inquiry sought to prove some fact (e.g., intent, plan, or knowledge) and had not laid a foundation for the testimony on such a ground. Resp. Exh. B, p. 20.

This court agrees that it was improper for the prosecutor to pursue this line of inquiry. The intent to inflame the jury was particularly evident with this line of questioning. *See* RT 2698–2699 (prosecutor using this evidence in his closing argument). The prosecutor was planting in the jury's mind that Cooper was a violent man who had shot at people before so the jury would more readily believe that he did it this time also. *Cf. Thomas v. Hubbard,* 273 F.3d 1164, 1177 (9th Cir.2001) (prosecutor's questioning of defendant about his use of firearm during prior criminal act, in violation of in limine order, constituted serious error despite curative instruction, because such evidence evokes visceral prejudicial reaction; in combination with other errors, required reversal of conviction). This also is a much closer call than for the first alleged instance of misconduct, but the court is not able to conclude that this line of questioning alone so infected the trial with unfairness as to make the resulting conviction a denial of due process. It does, however, affect the cumulative error analysis below.

### 2. *The Procedural Default Question*

Respondent contends that Cooper's prosecutorial misconduct claim must be dismissed as procedurally barred. Respondent argues that the state appellate court rejected the claim because Cooper had failed to raise a contemporaneous objection at trial on the ground of prosecutorial misconduct. The court disagrees.

 The procedural default doctrine forecloses federal review of a state prisoner's federal habeas claim if the claim was defaulted on in state court pursuant to an independent and adequate state procedural rule. *See Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). To find procedural default, a federal court must determine that the state court explicitly invoked a state procedural bar as an independent basis for its decision and that the state procedural bar cited was clear, consistently applied and well-established at the time of the petitioner's purported default, *see id.; Calderon v. United States Dist. Court (Bean),* 96 F.3d 1126, 1129 (9th Cir.1996), *cert. denied,* 520 U.S. 1204, 117 S.Ct. 1569, 137 L.Ed.2d 714 (1997). An order that is ambiguous with regard to procedural bars cannot preclude federal collateral review. *See id.* at 1131 (California Supreme Court order that did not specify which of 39 claims was barred by which of several state rules considered ambiguous and therefore insufficient to preclude federal collateral review).

 Here, the defense had raised objections to all three areas of evidence. "In each case, the trial court sustained certain defense objections but overruled others, allowing the prosecution to get the testimony before the jury." Resp. Exh. B, p. 17. Under California law, "claims of prosecutorial misconduct are subject to limited review on appeal in the absence of a contemporaneous objection raising the issue." *Id.* at 20. Generally the defendant must make an assignment of misconduct and request that the jury be admonished. *Id.* The state appellate court rejected Cooper's argument that the absence of an objection cannot bar appellate review where the error involves a denial of due process; the court did not consider "that the prosecutorial tactic at issue here can be regarded as having such an inflammatory and prejudicial impact." *Id.*

The California Court of Appeal's decision is at least uncertain as to whether it imposed the procedural default or overlooked it. Although respondent reads the state appellate court's decision as imposing the bar for failing to contemporaneously object, this court reads the decision as overlooking the procedural default and considering the claim on the merits. *See Thomas*, 273 F.3d at 1176 (alleged procedural default did not bar claim where state court addressed procedural default issue but left resolution of the issue uncertain, failing to make a clear and express statement that its decision was based on a procedural default). The California Court of Appeal's unclear decision will not result in a procedural bar to federal habeas review.

### G. Sufficiency Of Evidence

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt.'" *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see Payne v. Borg*, 982 F.2d 335, 338 (9th Cir.1992), *cert. denied*, 510 U.S. 843, 114 S.Ct. 131, 126 L.Ed.2d 94 (1993). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. *See Jackson*, 443 U.S. at 324, 99 S.Ct. 2781; *Payne*, 982 F.2d at 338. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West*, 505 U.S. 277, 296–97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (quoting *Jackson*, 443 U.S. at 326, 99 S.Ct. 2781).

Cooper did not clearly focus his attack on the sufficiency of the evidence, which requires this court to consider all the crimes of which he was convicted. The evidence was sufficient to support the kidnapping, carjacking and weapon possession convictions but not the murder conviction. The state court's presumed rejection of the claim was an unreasonable application of clearly established federal law, as determined by the U.S. Supreme Court.[11]

11. Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir.2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir.2002); *Bailey v. Newland*, 263 F.3d 1022, 1028 (9th Cir.2001); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir.2000). When confronted with such a decision, a federal court should conduct "an independent review of the record" to deter-

mine whether the state court's decision was an unreasonable application of clearly established federal law. *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982. The federal court need not otherwise defer to the state court decision under AEDPA: "A state court's decision on the merits concerning a question of law is, and should be, afforded respect. If there is no such decision on the merits, however, there is nothing to which to defer." *Greene*, 288 F.3d at 1089. In sum, "while we are not required to defer to a state court's decision when that court gives us nothing to

### 1. The Kidnapping, Carjacking and Weapon Convictions

██ Respondent points to the evidence that would have allowed a rational jury to find that a kidnapping and carjacking had occurred and that Cooper was guilty of those offenses. Evidence connected Cooper with Cross and Kingdom at the EZ–8 motel. And Cooper had a motive to harm Coco, because Coco reportedly had stolen Cross' car that contained a large amount of drugs paid for in part by Cooper. Cooper had been with Cross the day before the abduction searching for the drug-laden car and used threatening words regarding the stolen drugs and car. Cooper was identified as being present with Cross and Kingdom in the blue Delta 88 by Goodie Walton, Zanetta Hodges, and co-defendant Cross. Rodney Love could not identify any of the three assailants but did see that Coco involuntarily entered the trunk of the blue Delta 88 forced by one or more of the three men in the Delta 88. Cross' testimony supports the inference that Coco was put in the trunk of the car involuntarily, even if one believed that Cross was sitting in the front seat when it actually happened. Evidence from Cross showed that Cooper participated in putting Coco in the trunk at gunpoint. Evidence was presented that once the victim was put in the trunk of the car, the car drove away and Cross stated the car was driven to various locations around Oakland. Parker testified that he did not give anyone permission to take the red Corvette he drove to the site from which Coco was abducted and his car was taken. Cross testified Cooper had a gun that day.

The foregoing was sufficient evidence to support the kidnapping, carjacking and weapon possession convictions. For the kidnapping conviction, there was sufficient evidence that Coco was unlawfully moved by the use of force or by the fear instilled by Cooper's gun, that the movement of Coco into the trunk of the car and thereafter in the car was without his consent, and that Coco was moved for a substantial distance in the car. Cf. CT 869–870 (defining elements of kidnapping). Whether the carjacking victim is considered to be the passenger (Coco) or the driver (Parker), there was sufficient evidence that Cooper took the Corvette in the victim's immediate presence against the will of the victim and with the intent to either permanently or temporarily deprive the victim in possession of the vehicle of that possession and accomplished by means of force or fear. Cf. CT 866–867 (defining elements of carjacking). And there was sufficient evidence that Cooper had previously been convicted of a felony and knowingly possessed a firearm that was capable of being concealed upon his person on the day of the abduction. Cf. CT 877–878 (defining elements of the felon-in-possession-of-a-firearm charge).

### 2. The Murder Conviction

██ Even applying the very deferential standard of review appropriate for a sufficiency of the evidence claim, the evidence was not sufficient to support the murder conviction. No rational trier of fact could have found that the prosecution proved that Cooper had murdered Coco viewing the evidence in the light most favorable to the prosecution. Accepting that the victim was last seen alive being stuffed in the trunk of a car at gunpoint by three men including Cooper and that his dead body was found two weeks later, the two were not adequately connected. No properly admitted evidence put Cooper at

defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." *Fisher v. Roe,* 263 F.3d 906, 914 (9th Cir.2001).

the scene of the murder. That gap in evidence would have caused any rational trier of fact to find that Cooper's guilt was not proven beyond a reasonable doubt.

Identity was the key question, as the fatal bullet wound to the head of the gagged victim sufficiently showed the unlawful killing of one human being by another. The jury was instructed that the prosecution had the burden to prove beyond a reasonable doubt that the defendant was the person who committed the crime with which he was charged. CT 819.

Respondent identified several pieces of evidence that purportedly connected Cooper to the killing. First, the condition of the victim's body purportedly showed multiple perpetrators. The victim's pants had been pulled down to his upper thighs, his mouth was gagged with a piece of cloth consistent with the victim's T-shirt and the gag was secured by another cloth wrapped around his head. A pair of scissors was recovered about 4 feet from the victim's body. Respondent argues that the gagging and torture with scissors suggested the joint work of all three co-participants. While this may have suggested multiple perpetrators at the murder scene, it does nothing to show that one of those perpetrators was Cooper. Also, the evidence was speculative with respect to showing three perpetrators: none of the things done to the body actually required more than one person and one person (especially one person with a gun to compel compliance) could have done all. Second, the prosecutor tries to connect Cooper to the murder by pointing to the fact that more than one Black male was seen throwing suspected evidence off the San Mateo Bridge from the red Corvette. This requires speculation that the airborne rectangle package seen fleetingly by an observant bystander contained a gun and that gun had been used to kill Coco. *See*

*Walters v. Maass,* 45 F.3d 1355, 1358 (9th Cir.1995) (mere suspicion and speculation do not support logical inferences). Cooper was not actually identified as being at the scene of that incident, although his presence in the car less than three hours earlier supports a reasonable inference that he was in the car on the bridge. Third, respondent argues that the testimony that the blue Delta 88 and the red Corvette were driven about and abandoned on the evening of the shooting shows multiple participants remained active in the hours following the kidnapping. That participants were still "active" after the kidnapping and shooting proves nothing about what they were actively doing. Fourth, Cooper was arrested riding in a car in which he was sitting on top of a pair of black gloves and in which there was a jacket in the back seat—all of which had gunshot residue on them. The criminalist admitted the gunshot residue test could not determine *when* gunshot residue was deposited on a surface and could not determine *whether* it was deposited on the surface by transferrance or because a person wore the gloves and jacket while shooting. The usefulness of the jacket and glove evidence also was limited by poor collection efforts (i.e., they were not retrieved until the car had been in and out of police impound and released to the driver's parents and they were not retrieved by a person wearing latex gloves to avoid cross-contamination). The connection between Cooper and the jacket was weak because the jacket was obtained from the back seat of the car in which Cooper had been riding as a mere passenger and the driver of the car testified to owning the jacket. The inference that Cooper owned the gloves he sat on top of was far more believable than that he owned the jacket in the back seat.

There was evidence that weakened the case against Cooper. First, the coroner was unable to fix a time of death for Coco

because his body was badly decomposed. There was less than a seven hour window of opportunity for Cooper to have committed the murder. Coco was abducted at 4:00 p.m. and Cooper was arrested at 11:00 that night. If one were to accept the prosecutor's theory that the murder weapon was disposed of by being thrown off the San Mateo Bridge at 7:00 p.m. the window of opportunity decreased to three hours. The longer the period of time between the abduction and the murder, the weaker the connection between the two. Because Cooper could have committed the murder only within seven hours of the abduction and the coroner could not determine the time of death, Coco could have been killed after August 3 (and therefore by someone other than Cooper). Second, there was no ballistic match. The two shell casings found at the abduction scene did not match the bullet taken from Coco's skull miles away at the murder scene. The shell casings were 9MM shells and the murder bullet was a .40 caliber. The only testimony about Cooper's gun possession that day was that he had a 9MM gun, which would be consistent with him having shot at the abduction scene but not having murdered the victim. Third, there was no blood on the gloves or the jacket that the prosecutor associated with Cooper, although the autopsy indicated that the bullet had been fired at close range. Fourth, there were no cloth fibers on the gloves, although one could get fibers on the gloves if he tore something while wearing them. Fifth, there was no fingerprint evidence connecting Cooper to either car or to the murder scene.

Lastly, there was no eyewitness to the killing. In determining the sufficiency of the evidence, the court excludes the improperly admitted statement of Kingdom which should not have been admitted at trial because Cooper was unable to confront him. *See Wigglesworth v. Oregon,* 49 F.3d 578, 582 (9th Cir.1995). This piece of evidence is critical because if it was included in the evaluation, the court would find that there was sufficient evidence to support the murder conviction.

If the question was whether the evidence showed that Cooper probably murdered the victim, the answer would be yes. But "probably" is not the standard: a jury must find proof of guilt beyond a reasonable doubt.[12] A rational jury could not have done so here. At the simplest level, proof that (1) a person was abducted at gunpoint and (2) his murdered body turned up two weeks later in another part of town would not be proof beyond a reasonable doubt that the abductor was the murderer. One must look for other evidence to allow one to connect the abductor to the murder. Here, there just was not enough. Cooper's right to due process was violated because the evidence was insufficient to support the murder conviction. He is entitled to the writ on this claim.

 When, as here, the evidence is determined to be insufficient when the improperly admitted evidence is excluded from the equation but sufficient when the improperly admitted evidence is included in the equation, the remedy is affected. In such a case, retrial rather than acquittal is the remedy. "[T]he Double Jeopardy Clause allows retrial when a reviewing court determines that a defendant's convic-

---

**12.** The jurors were given California's pattern reasonable doubt instruction: "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." CT 818.

tion must be reversed because evidence was erroneously admitted against him, and also concludes that without the inadmissible evidence there was insufficient evidence to support a conviction." *Lockhart v. Nelson,* 488 U.S. 33, 40, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). In other words, the Clause "does not bar retrial after a reversal based on the erroneous admission of evidence if the erroneously admitted evidence supported the conviction." *United States v. Chu Kong Yin,* 935 F.2d 990, 1001 (9th Cir.1991) (citing *Lockhart,* 488 U.S. at 40, 109 S.Ct. 285); *see also Wigglesworth,* 49 F.3d at 582.

The petition for writ of habeas corpus will issue because Cooper's right to due process was violated because there was not sufficient evidence to support the murder conviction. The claims concerning the sufficiency of the evidence on the kidnapping and carjacking convictions are rejected.

The results are different for the insufficient evidence claim and the Confrontation Clause claim in that only the murder conviction must be set aside for the former while all Cooper's convictions must be set aside for the latter. This difference is not inconsistent or a mistake. Rather it results from the different standards of habeas review. In looking at the sufficiency of the evidence, the federal habeas court must view the evidence in the light most favorable to the prosecution, *see Jackson,* 443 U.S. at 319, 99 S.Ct. 2781, but the evidence need not be viewed in the light most favorable to the prosecution in a harmless error analysis of other constitutional errors.

## H. *Cumulative Error*

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford,* 334 F.3d

862, 893–95 (9th Cir.2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution); *Thomas v. Hubbard,* 273 F.3d at 1179–81 (reversing conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement providing only evidence that defendant had motive and access to murder weapon; (b) prosecutorial misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness); *United States v. Frederick,* 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect of improper vouching by prosecutor, improper comment by prosecutor about defense counsel, and improper admission of evidence previously ruled inadmissible required reversal even though each error evaluated alone might not have warranted reversal). Cumulative error is more likely to be found prejudicial when the government's case is weak. *See id.; see, e.g., Thomas,* 273 F.3d. at 1180 (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).

The court has determined that there was a Confrontation Clause violation that was not harmless error. The court has also determined that Cooper's right to due process was violated because there was insufficient evidence to support the murder conviction—a determination which shows that it was not harmless error. The court also has determined that there was prosecutorial misconduct, but found that the instances of prosecutorial misconduct alone did not have a substantial and injurious

effect on the verdict. This requires that the court determine whether Cooper has shown cumulative error. (The California courts did not discuss this claim.)

 Cooper is entitled to relief on his cumulative error claim. The prosecutorial misconduct that occurred included eliciting evidence that Cooper was very familiar with guns, had a violent reputation and reportedly had shot at people before this crime took place. Although that misconduct by the prosecutor did not alone have a sufficient impact on the fairness of the trial such that the court could conclude a due process violation had occurred, the cumulative effect of that misconduct, plus the improperly admitted statement from Kingdom (i.e., the Confrontation Clause error), plus the insufficient evidence to support the murder conviction (i.e., the Due Process Clause error), considered together, prejudiced Cooper so much that his conviction on all counts must be set aside.

### CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is GRANTED. Cooper's conviction is VACATED and respondent is ordered to release Cooper from custody within sixty days of the date this order is filed unless the State of California reinstitutes criminal proceedings against him.

Petitioner's application for appointment of counsel, which he filed with his traverse, is DENIED. (Docket # 31.)

The clerk shall send a copy of this order to the Alameda County Public Defender's Office at Suite 400, 1401 Lakeside Drive, Oakland, CA 94612. The court requests that the Alameda County Public Defender

obtain representation for Cooper if he meets the eligibility requirements.

IT IS SO ORDERED.